## OKC CORP.

v.

### Harold M. WILLIAMS et al.

### Civ. A. No. CA–3–78–1021–G.

United States District Court,
N. D. Texas,
Dallas Division.

Feb. 3, 1979.

On Reconsideration Feb. 22, 1979.

Brice & Barron by George B. Davis, Dallas, Tex., Ford, Marrin, Esposito, Witmeyer & Bergman by John J. Witmeyer, III, Richard B. Marrin, New York City, Arthur Mitchell, Gen. Counsel, Robert A. Miller, G. Scott Damuth, Dallas, Tex., for OKC Corp.

Michael J. Stewart, Regional Administrator, S. E. C., Cecil S. Mathis, Jr., David A. Watson, Steven K. McGinnis, Fort Worth, Tex., for defendants; Walter E. Keller, Jr., Fort Worth, Tex., James H. Schropp, Asst. Gen. Counsel, Julie Allecta, S. E. C., Washington, D. C., of counsel.

### ORDER GRANTING PARTIAL SUMMARY JUDGMENT

PATRICK E. HIGGINBOTHAM, District Judge.

This court's order of November 22, 1978, stated that if the SEC were sufficiently

implicated in a private party taking of the Locke, Purnell report from OKC, then the agency would be found to have violated OKC's Fourth Amendment rights. Today we hold that because there was in fact no private party taking and OKC has failed to show a genuine issue of fact with regard to the involvement of the SEC in any "taking," no unconstitutional seizure of the report occurred.

## I.

### The Claimed Private Taking

The crucial facts are undisputed. At an OKC board of directors meeting on November 1, 1977, the decision was made to distribute copies of the report to all board members. A member of the board, Gary Adams, received his copy of the report in the mail a few days later. No cover letter instructing Adams as to any limitation on his use of the document 'accompanied it. Adams turned the report over to Wade, an OKC employee. A copy of this report was made and voluntarily exchanged among Wade, David Ownby, and Tom Patrick. Ownby and Patrick later delivered it to the Commission.

The Fourth Amendment does not protect a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *see United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Alderman v. United States*, 394 U.S. 165 at 179, n.11, 89 S.Ct. 961 at 969, n.11, 22 L.Ed.2d 176 (1969); *United States v. Mendoza*, 473 F.2d 692 (5th Cir. 1972). In *Hoffa*, Partin, a government informer, testified to conversations which occurred in the defendant's hotel room and which were either directed at the informer or conducted knowingly in his presence. The court held that there had been no unconstitutional seizure. Similarly in *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), the court held that evidence obtained by a recording device hidden on the person of an informant was admissible. The court stated, "The risk of

being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* at 465, 83 S.Ct. at 1402. *See On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

While it is true that the above cases involved the revelation of conversations, the Fifth Circuit had determined that "[n]o meaningful distinction can be drawn between betrayal by relating the substance of a conversation" and betrayal by search or seizure of a tangible object. In *Mendoza v. United States, supra,* participants in a narcotics conspiracy entrusted a government informer whom they believed to be a member of the conspiracy with possession of an automobile for the purpose of constructing in it a secret compartment for further drug smuggling. The informer permitted government agents to search the car. Explicitly refusing to distinguish between that situation and the ones presented in *Hoffa, White,* and *Alderman, supra,* the Circuit observed that "the risk of being betrayed by an informer is one of those risks that conspirators necessarily assume." *Id.* at 695.

The instant case is indistinguishable from this line of authority. Adams rightfully possessed the report. When he handed it over to Wade, he (and OKC) took the risk that Wade or whomever Wade chose to show it to would reveal not only the contents of the report but also the report itself to the government. That other members of the board did not intend for Wade to have possession of the report is irrelevant. They took the risk that one of their associates would let the rest down.

Contending that Adams gave the report to Wade for the limited purpose of performing a tax analysis, OKC argues that a finding of no private party taking would also allow a corporation's file clerk, at the government's behest, to hand over to the government confidential documents under his control. This court's decision does not

sweep so broadly. It must be read against the established law of custodial possession. If a property owner gives mere custodial possession of property to another, and that person, at the urging of government officials, turns the property over to them, there may well be a seizure in the sense of the Fourth Amendment. *United States v. Pryba*, 163 U.S.App.D.C. 389, 502 F.2d 391 (D.C. Cir.1974); *see United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977); *Barnes v. United States*, 373 F.2d 517 (5th Cir. 1967). Even if Adams did give the report to Wade for a tax analysis only, Wade's possession and control was much more than that of a custodian. It was more closely analogous to that of the informer in *Mendoza*. Although that informer was given the automobile for a limited purpose— that of constructing a secret compartment—his authority over the automobile was greater than that of a custodian.

This court recognizes that the corporate entity here possesses unique legal problems. Under the Fourth Amendment, however, the rule that a taking (at the behest of the government) by one in mere custodial possession amounts to a private party seizure sufficiently protects a corporation's reasonable expectation of privacy. Although Adams or another corporate executive might have a subjective expectation that an associate with whom he entrusts corporate information will not disclose it, this expectation is not sufficient to bring the Fourth Amendment into play. His expectation must also be objectively reasonable. If an executive reveals the contents of documents or communicates ideas to his associate whether for the associate's edification or for his performance of a specialized task, for purposes of the Fourth Amendment he runs the risk that the associate may reveal the matter entrusted to him. Simply stated, "The Fourth Amendment does not pro-

tect against unreliable (or law-abiding) associates." *Katz v. United States*, 389 U.S. 347, 363, 88 S.Ct. 507, 518, 19 L.Ed.2d 576 (White, J., concurring). There was, therefore, no private party taking.

## II.

### *No SEC Entreaty to Obtain the Report*

The SEC has sworn that the "taking" of the report was without its knowledge and was not at its urging or request. OKC has not in response produced evidence sufficient to create a fact question as to SEC participation or as to a plausible link between the Department of Energy, which arguably had prior knowledge, and the SEC.[1]

Alternatively, if the SEC had been aware of the report and had requested Ownby and Patrick obtain a copy of it, however, OKC's Fourth Amendment rights would not have been violated because the report was not improperly seized.

The SEC's motion for summary judgment on Phase I of this case is GRANTED.

## ON RECONSIDERATION

After reconsidering its ruling of February 2, 1979, granting the SEC's motion for summary judgment, this court is of the opinion that its holding that a corporate employee having more than mere custodial possession of a document may voluntarily hand it over to the government without running afoul of the fourth amendment may sweep too broadly. The expectation of privacy in the information imparted to the SEC, *when* imparted to it was not high and arguably not objectively reasonable. And it is doubtful that consent to search analysis ought to be applied to this delivery of information. Regardless, the resolution of this difficult constitutional issue is unnecessary

1. We note without deciding that arguably under some circumstances, even if the informer was properly in possession of the item in question, judicial inquiry into the government's involvement might be necessary. For example, evidence that the government overcame the will of the informer with threats or inducements rising to the level of duress or coercion should raise serious Fourth Amendment questions. *See Hodge v. United States*, 539 F.2d 898 (6th Cir. 1976). This is not such a case, however. Indeed, OKC argues that as part of a scheme to undermine the established leadership in the corporation, Patrick and Ownby willingly went to the SEC.

to the disposition of this case. The teaching of *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (J. Brandeis) is that prudence requires avoidance of such difficult questions ". . . unless obliged to do so in the proper performance of our judicial function . . .." *Id.* 341, 56 S.Ct. 480.

This court granted the SEC's motion on two other and independent grounds. It found not only that there was no private party seizure of the Locke, Purnell report, but also that no genuine issues of material fact existed as to the SEC's participation in the obtaining of the report or as to a plausible link between the DOE and the SEC. The court remains persuaded that its latter position is sound. The record does not support OKC's suggestion that the SEC's involvement is somehow linked to a 1977 SEC–DOE joint task force which studied DOE law enforcement methods. Theodore Levine, an SEC representative on that task force, learned in the course of the study about several DOE investigations including the DOE investigation of OKC. Levine has testified, however, that his knowledge of OKC's alleged illegal conduct was limited to oil pricing practices that may have violated DOE regulations. Larry W. White, formerly at the DOE and a member of the task force, confirmed Levine's testimony. White also stated that it was not the DOE's practice to inform other government agencies of possible illegalities not under the DOE's jurisdiction. Finally, he testified that he has no recollection of members of the task force mentioning a relationship between enforcing the energy and securities laws.

OKC's efforts to concoct a fact question out of evidence that the DOE made copies of the Locke, Purnell report also must fail. OKC contends that "the copies were made with everyone's knowledge for delivery to the SEC" and that the DOE "arranged for a copy to be delivered to the SEC." The testimony of Harold Clements (the DOE official who made and delivered the copies to Wade), of Wade, and of Ownby indicates that the DOE was unaware that one of the copies it made might later be delivered to the commission. Because there are no fact questions about an SEC–DOE link, the manner in which the DOE itself obtained the report is irrelevant.

Regardless of whether there was a private party seizure of the report, OKC has raised no fact question as to the SEC's prior connection with, knowledge of, or participation in that seizure. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1975).

This court has carefully reviewed the voluminous materials submitted. It is convinced that there is no ". . . *genuine* issue as to any *material* fact . . .." Rule 56 F.R.C.P. (emphasis supplied.) Summary judgment ought to be used sparingly in claims laced with constitutional overtones. But the standard ought not be one of "slightest doubt." *See Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972). The plain language of the rule is genuine issue and to require a movant to show more than the absence of a "genuine" issue is to impose judicial gloss upon the rule. Out of concern for the seriousness of the allegations leveled by OKC, the court effectively stopped an SEC investigation for over six months. After an enormous effort by OKC, including the taking of testimony from virtually any person in government in any manner connected to these facts, OKC's allegations now stand on a claimed link between the SEC and the DOE that tainted the delivery of the report to the SEC. The "issue," despite a mighty effort by resourceful counsel, leaves me firmly convinced that only concocted, not genuine, issues of fact remain. If Rule 56 is to have any meaningful role in complex cases, the courts must be sensitive to sifting the real from the fanciful.

Partial summary judgment therefore is granted. OKC's motion for stay pending appeal is denied. *See Midwest Growers Cooperative Corp. v. Kirkimo*, 533 F.2d 455, 465 (9th Cir. 1976).